UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____
                                        )
In re:                                  )          Chapter 11
                                        )
LYONDELL CHEMICAL COMPANY, *et. al.*    )          Case No. 09-10023 (REG)
                                        )          (Jointly Administered)
                         Debtors.       )
_____ )
                                        )
EDWARD WEISFELNER, as Trustee of the    )
LB LITIGATION TRUST,                    )
                                        )
                         Plaintiff      )
                                        )
           v.                           )
                                        )
LR2 MANAGEMENT, K/S,                    )          Adv. Pro. No. 10-05358 (REG)
                                        )
                         Defendant.     )
_____ )


DECISION AFTER TRIAL


APPEARANCES:

BROWN RUDNICK LLP
*Counsel for Plaintiff Edward S. Weisfelner,*
*as Litigation Trustee Plaintiff LB Litigation Trust*
One Financial Center
Boston, MA 02111
By:    Steven D. Pohl, Esq.
Thomas H. Montgomery, Esq.
Timothy J. Durken, Esq.

JUNGE & MELE LLP
*Counsel for the Defendant LR2 Management, K/S*
250 West 57th Street, Suite 2532
New York, NY 10107
By:    Peter Junge, Esq.
       Armand Mele, Esq.

ROBERT E. GERBER
UNITED STATES BANRUPTCY JUDGE

In this adversary proceeding under the chapter 11 cases of Lyondell Chemical Company

("**Lyondell**"), *et al.,* Edward Weisfelner as Trustee of the LB Litigation Trust ("**Trustee**") seeks

to recover allegedly preferential transfers made by Equistar Chemicals, LP ("**Equistar**"), a

Lyondell subsidiary, to LR2 Management, K/S ("**LR2**"):  one in the amount of $2,057,851.25 for

payment of "freight charges" (the "**Freight Charges Transfer**"), and the other in the amount of

$12,298.08 for reimbursement of "quay dues" (the "**Quay Dues Transfer**").

For the reasons set forth below, the Court finds that:

(1) The Freight Charges Transfer is not avoidable because it satisfies the elements

of the "contemporaneous exchange" defense under Bankruptcy Code section 547(c)(1),

and one (though not the other) of the "ordinary course of business" defenses set forth in

section 547(c)(2)—the "ordinary business terms" defense under section 547(c)(2)(B).

(2) The Quay Dues Transfer is not avoidable because it satisfies the elements of

the "ordinary business terms" defense under section 547(c)(2)(B).

Accordingly, judgment will be entered in favor of LR2.[1]

---

[1]    This preference recovery action is a classic core matter by statute under 28 U.S.C. § 157(b)(2)(F), and, in this Court's view, an action in which a bankruptcy judge has the constitutional power to enter a final judgment.  To the extent any higher court doesn't agree, this Court's conclusions should be regarded as merely proposed, subject to the district court's revised order of reference to the bankruptcy courts in this district—providing, in relevant part:

If a bankruptcy judge or district judge determines that entry of a final order or judgment by a bankruptcy judge would not be consistent with Article III of the United States Constitution in a particular proceeding referred under this order and determined to be a core matter, the bankruptcy judge shall, unless otherwise ordered by the district court, hear the proceeding and submit proposed findings of fact and conclusions of law to the district court.  The district court may treat any order of the bankruptcy court as proposed findings of fact and conclusions of law in the event the district court concludes that the bankruptcy judge could not have entered a final order or judgment consistent with Article III of the United States Constitution.

<u>Findings of Fact</u>[2]

On November 20, 2008, Equistar entered into a charter party contract (the "**Charter Contract**")[3] with LR2 to charter the vessel TORM VALBORG to transport a minimum of 80,000 metric tons of petroleum condensate from Algeria to ports in Texas.[4]  LR2 and Equistar had no prior business history.[5]  The final terms of the Charter Contract were set forth in a message (dated November 21, 2008) and a later addendum (dated November 24, 2008) in which the parties agreed to incorporate the terms of the standard form of contract published by the Association of Ship Brokers & Agents (U.S.A.) Inc. (the "**Standard Form of Contract**"), as well as certain additional clauses standard in Lyondell shipping contracts.[6]  The Standard Form of Contract provides, in relevant part, that "[p]ayment of freight shall be made by Charterer without discount upon delivery of cargo at destination…."[7]

On December 2, 2008, SONATRACH, the national oil company of Algeria and the seller of the Cargo, issued a "clean on board" bill of lading as to Equistar's order, indicating that 78,809.469 metric tons of condensate (the "**Cargo**") had been loaded onto the TORM VALBORG at Bejaia, Algeria, for delivery to the United States.[8]  On December 3, 2008, LR2

---

Amended Standing Order of Reference Re: Title 11, M10–468, 12 Misc. 00032, dated January 31, 2012 (Preska, C.J.).  *See Executive Benefits Ins. Agency v. Arkison*, 134 S.Ct. 2165, 2174 (2014) (approving such a procedure).

[2]    The Court took the evidence in a summary trial, based on undisputed facts, declarations and documents.  The Court did not find any of the underlying evidentiary facts to be disputed, and regarded all witnesses as fully credible.  The Court has, however, drawn conclusions from the evidentiary facts, which it regards as mixed questions of fact and law.

[3]    In their submissions to the Court, the parties referred to the Charter Contract as the "Charter Party."  Here and in other places, the Court has substituted descriptions that are more meaningful to a reader who might be less familiar with the parties' practices than the parties were.

[4]    Plaintiff Trustee's Statement of Undisputed Facts ("**Pl. Undisputed Facts**") (ECF # 24) ¶ 1.

[5]    *Id.*

[6]    *Id.* at ¶ 2.

[7]    *Id.* at ¶ 3, quoting Standard Form of Contract Part II ¶ 2.

[8]    *Id.* at ¶ 4.

2

made a payment in the amount of $12,298.08 to the loading port in Bejaia, Algeria on behalf of Equistar, known as "Quay Dues."[9]  On December 4, 2008, LR2 issued an invoice to Equistar in the amount of that same $12,298.08 for reimbursement of the Quay Dues (the "**Quay Dues Invoice**").[10]  The Quay Dues Invoice was accompanied by a letter requesting payment "within 7 days."[11]

About a week later (December 10, 2008), LR2 issued another invoice to Equistar in the amount of about $2 million—$2,057,851.25—for freight charges for the shipment of the Cargo (the "**Freight Invoice**").[12]  The Freight Invoice provided:  "[a]s per [Charter Contract] defined freight is payable upon completion of discharge.  We hereby reserve our rights to claim interest at the rate of 1 month usd LIBOR plus 5 percent p.a., if freight payment is not received within normal 3 banking days, unless [Charter Contract] states otherwise."[13]

Sometime between December 18, 2008 and December 20, 2008, pursuant to the Charter Contract, the TORM VALBORG discharged a portion of the Cargo at a port in Corpus Christi.[14]  Between December 24, 2008 and December 26, 2008 at 1:55 a.m. (central time), the TORM VALBORG completed discharge of the Cargo at a port in Houston.[15]

---

[9]     Pl. Undisputed Facts ¶ 8.  Quay dues are charges associated with use of a loading port.  *Id.*  LR2's industry expert explained in his declaration that in some cases, vessel owners require charterers to pay quay dues directly to the port authority, but when a vessel owner agrees to advance the quay dues payment, it does so with the expectation that it will be reimbursed at the conclusion of the voyage.  John R. Dudley Decl. (ECF # 17) n. 1.

[10]    Pl. Undisputed Facts ¶ 8.

[11]    *Id.*

[12]    Pl. Undisputed Facts ¶ 9.

[13]    Defendant's Statement of Undisputed Facts ("**Def. Undisputed Facts**") ¶ 11.

[14]    Pl. Undisputed Facts ¶ 5.

[15]    *Id.* at ¶ 6.

In the period during which the TORM VALBORG transported the Cargo, Lyondell was experiencing a "severe cash shortage."[16]  On December 22, 2008—a date after the earliest of the Cargo had been discharged, but before the last of it had been—Lyondell stopped its customary practice of paying its vendors through its automated system.[17]  In lieu of the automated system, Lyondell's senior management decided to prioritize payments to certain critical vendors, including LR2.[18]

On December 30, 2008—four  calendar days (and two business days) after discharge of the Cargo was completed—Equistar made two wire transfers to LR2 in the amounts of $2,057,851.25 (the amount of the Freight Invoice) and $12,298.08 (the amount of the Quay Dues Invoice)—thus making the Freight Charges Transfer and Quay Dues Transfer, respectively.[19]  It was Equistar's practice to pay shipping vendors within three or four days after the completion of the discharge of cargo.[20]  As established by LR2's expert, this was generally consistent with industry-wide practice.[21]  As also established by LR2's expert, an expense item incurred by a vessel owner during the course of a voyage is "customarily paid with or immediately after the payment of ocean freight," and "when [a vessel] owner agrees to advance the payment [of an expense], it is with the understanding that full reimbursement will be received at the conclusion of the voyage.…"[22]

On January 6, 2009, Equistar, along with Lyondell and many other Lyondell affiliates, filed a chapter 11 petition in this Court.  On January 9, 2009, LR2 sent a third invoice to Equistar

---

[16]     Pl. Undisputed Facts ¶ 17; Donald Hamilton Decl. (ECF # 23) ¶ 7.

[17]     Pl. Undisputed Facts ¶¶ 17, 21.

[18]     *Id.* at ¶¶ 22, 26.

[19]     Pl. Undisputed Facts ¶ 30.

[20]     Cynthia M. Guttinger Decl. (ECF # 22) ¶ 6.

[21]     Supp. John R. Dudley Decl. (ECF # 30) ¶ 6.

[22]     Dudley Decl. n. 1.

in the amount of $136,262.66 for "demurrage" charges[23] under the Charter Contract.[24]  This invoice did not include any payment terms.[25]  Equistar did not make any payment on the demurrage invoice, and LR2 filed a proof of claim in the chapter 11 case for amounts owing under that invoice.[26]

<u>Conclusions of Law</u>

LR2 doesn't dispute that the Freight Charges Transfer and Quay Dues Transfer satisfy the elements of section 547(b) and thus would be deemed to be preferential transfers in the first instance.[27]  Rather, LR2 argues the Trustee cannot avoid the Freight Charges Transfer or the Quay Dues Transfer because each qualifies for one or more valid defenses to avoidance under the following subsections of section 547(c).  LR2, as the party against whom recovery is sought, has the burden of proving that a preference defense applies,[28] by a preponderance of the evidence.[29]

As potentially applicable under the facts here, section 547(c) contemplates two[30] potential defenses to a preference transfer:

> (1) the "contemporaneous exchange" defense under section 547(c)(1), and

---

[23]    Demurrage charges arise from "laytime" on the voyage beyond the "laytime allowance" in the Charter Contract for loading and unloading cargo.  Pl. Undisputed Facts ¶ 10.

[24]    Pl. Undisputed Facts ¶¶ 10, 31.

[25]    *Id.* at ¶ 10.

[26]    Pl. Undisputed Facts ¶¶ 31, 33.

[27]    Accordingly, the Court makes no finding as to the satisfaction of section 547(b), but accepts it as true.

[28]    Section 547(g).

[29]    *See*, *e.g.*, *Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.),* 78 F.3d 30, 39 (2d Cir. 1996) ("***Roblin Industries***"); *Buchwald Capital Advisors LLC, v. Metl–Span I., Ltd.* (*In re Pameco Corp.*), 356 B.R. 327, 338 (Bankr. S.D.N.Y. 2006) (Gropper, J.).

[30]    A third commonly invoked defense to a preference action, the "new value" defense of section 547(c)(4), is not asserted to be applicable here.

(2) the "ordinary course of business" defense under section 547(c)(2)—which in turn can be satisfied in two separate ways, as set forth in subsection (c)(2)'s separate subparagraphs (A) and (B).[31]

The relevant provisions provide:

> (c) The trustee may not avoid under this section a transfer—
>
> (1) to the extent that such transfer was—
>
>> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>>
>> (B) in fact a substantially contemporaneous exchange;
>
> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
>
>> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>>
>> (B) made according to ordinary business terms….

Here the Court finds that although Equistar had begun to tactically prioritize payment of certain obligations over others when it made the Freight Charges Transfer and Quay Dues Transfer—thereby foreclosing LR2's reliance on section 547(c)(2)(A)—LR2 has nevertheless met its burden of showing that the Freight Charges Transfer was a contemporaneous exchange

---

[31]    Prior to 2005, section 547(c)(2) required a creditor to prove that the transfer was made *both* in the ordinary course of the debtor's business under Section 547(c)(2)(A) and according to ordinary business terms under Section 547(c)(2)(B).  The BAPCPA amendments made the test disjunctive, allowing a defendant to prevail by proving either the so called "subjective" test under Section 547(c)(2)(A), or the so called "objective" test under Section 547(c)(2)(B).  *See Jacobs v. Gramercy Jewelry Mfg. Corp. (In re M. Fabrikant & Sons, Inc.)*, 2010 Bankr. LEXIS 3941, *5-6, 2010 WL 4622449, at *2 (Bankr. S.D.N.Y. Nov. 4, 2010) (Bernstein, C.J.).  As the wording of the subsections was not otherwise changed by BAPCPA in 2005, the case law prior to BAPCPA's enactment as to the requirements of each subsection remains good law. *See id.* 2010 Bankr. LEXIS 3941, at *6**,** 2010 WL 4622449, at *2 (citations omitted).

for new value under section 547(c)(1), and that both the Freight Charges Transfer and the Quay

Dues Transfer were made according to ordinary business terms under section 547(c)(2)(B).

I.

The Freight Charges Transfer

The Trustee contends that LR2 has failed to show that the Freight Charges Transfer

satisfies any of the section 547(c) defenses to avoidance.  But for the reasons below, the Court

finds that the Freight Charges Transfer was both a contemporaneous exchange within the

meaning of section 547(c)(1), and made according to ordinary business terms within the meaning

of section 547(c)(2)(B).

*A.  Contemporaneous Exchange*

The purpose of the contemporaneous exchange defense is to "encourage creditors to

continue to deal with financially-distressed debtors, as long as their transactions involve true

exchanges of equally-valued consideration."[32]  "Other creditors are not adversely affected by

such an exchange because the debtor [ ]...has received new value."[33]  Accordingly, the exception

protects transactions that are technically "on account of an antecedent debt," but were not true

credit transactions, from being avoided.[34]

To establish this defense, a defendant must demonstrate, by a preponderance of the

evidence:

(1) that new value was received in exchange for the transaction;

---

[32]   *Silverman Consulting, Inc. v. Canfor Wood Products Marketing* (*In re Payless Cashways, Inc.*), 306 B.R. 243, 249 (B.A.P. 8th Cir. 2004), aff'd, 394 F.3d 1082 (8th Cir. 2005).

[33]   *Lindquist v. Dorholt (In re Dorholt, Inc.),* 224 F.3d 871, 873 (8th Cir.2000).

[34]   *See Ames Merchandising Corp. v. Revere Mills Inc. (In re Ames Dep't Stores, Inc.)*, 2010 Bankr. LEXIS 2991, *17, 2010 WL 2403104, *6 (Bankr. S.D.N.Y. June 10, 2010) (Gerber, J.) ("***Ames-Revere***").

7

(2) that the parties intended the transaction to be a contemporaneous exchange; and

(3) that the transaction was, in fact, a substantially contemporaneous exchange.[35]

*1. Receipt of New Value*

"New value" is defined in section 547(a)(2) of the Code as "money or money's worth in goods, services, or new credit. . . ."  The Trustee argues that Equistar did not receive new value in exchange for the Freight Charges Transfer because that payment was for "previously rendered services."[36]  But the Court agrees with LR2 that there is no requirement that payment must be given before value is provided in order to qualify for the defense.[37]

The two elements of the transaction between LR2 and Equistar—the delivery of the Cargo and the transfer of the Freight Payment—occurred close enough in time that the payment reasonably correlates to the receipt by Equistar of LR2's delivery of value.[38]  That the parties each performed their obligations under the Charter Contract—and that Equistar simply made timely payment under the terms of that agreement—further supports a finding that there was a true exchange of value between the parties.[39]  While the Trustee cites a number of cases in which courts have found a transfer made subsequent to the provision of value by the transferee was not "new value", the majority of those cases involved the payment of *overdue* obligations, as

---

[35]    *See id.*

[36]    Trustee Plaintiff's Trial Brief (ECF # 21) ("**Pl. Trial Br**.") at 14-15.

[37]    *See, e.g., Peltz v. Hartford Life Insurance Co. (In re Bridge Information Systems, Inc.)*, 321 B.R. 247, 255 (Bankr. E.D. Miss. 2005) ("***Bridge Information***") (holding that transfer by the debtor one week after receipt of value from transferee provided "new value").

[38]    The Trustee appears to argue that LR2 provided value over the course of the shipping process, rather than at the completion of discharge.  Though it does not materially affect the Court's analysis, the Court disagrees.  Rather, the Court agrees with LR2 (*see* Def. Post-Trial Opp. Br. (ECF # 32) at 13) that the value provided by LR2 to Equistar was the full and complete delivery of the Cargo, which was achieved only once discharge was complete.

[39]    *See Jones Truck Lines, Inc. v. Central States, S.E. and S.W. Areas Pension Funds (In re Jones Truck Lines, Inc.)*, 130 F.3d 323, 327 (8th Cir.1997) (distinguishing between payments made on account of current obligations and payments made for past due obligations).

opposed to current obligations, as is the case here.[40]  The payment of a current obligation does

not implicate the underlying policy rationale of the preference provisions to prevent harm to a

debtor's "financial position on the eve of bankruptcy to the detriment of [its] other creditors,"

because the debtor is receiving value directly in exchange for such payment.[41]

A transfer made subsequent to the provision of value is not infrequently incident to a

credit transaction ineligible for the contemporaneous exchange defense.  But such a transfer is

not necessarily so.  And it does not *automatically* create a situation in which a contemporaneous

transaction was not intended.  Here, there is nothing in the record indicating that the exchange

between the parties was intended to be, or was in fact, a true credit transaction as long as

Equistar made payment within 3 business days of delivery of the Cargo.  While the debt was

technically antecedent to the Freight Charges Transfer, the amount of time between the debt's

arising and Equistar's payment was minor given the nature and size of the underlying

transaction.

Because LR2 has shown that the parties made a true exchange of equally-valued

consideration consistent with the terms of the Charter Contract, the Court finds that the Freight

Charges Transfer meets the "new value" requirement.

## 2. Intended Contemporaneous Exchange

The intent of the parties is a question of fact.  The question is whether at the time the

Charter Contract was formed, the parties regarded the exchange of delivery of Cargo and

payment of the Freight Charges Transfer as contemporaneous.  Parties' testimony regarding

---

[40]     *See* Pl. Trial Br. at 14-15, 20 (citing *Keydata Corp. v. Boston Edison Co. (In re Keydata Corp.)*, 37 B.R. 324 (Bankr. D. Mass. 1983) (payments made one month past due date); *Kipperman v. Onex Corp.*, 411 B.R. 805 (N.D. Ga. 2009) (payment made two months past due date)).

[41]     *Bridge Information*, 321 B.R. at 255 (citing *Harrah's Tunica Corp. v. Meeks (In re Armstrong)*, 291 F.3d 517, 526 (8th Cir. 2002)).

intent after the fact can often be self-serving, and so courts will often look to circumstantial

evidence to determine the parties' intent.[42]

While both parties point to the terms of the Charter Contract and the Freight Invoice, they

disagree as to what those terms show about the parties' intent.  The Charter Contract and Freight

Invoice contemplated payment upon delivery of the Cargo.[43]  The Freight Invoice further

provided for a 3 business day grace period for Equistar to make payment without incurring any

penalty, and allowed LR2 to start charging Equistar interest only after those 3 business days

passed without payment being made.[44]  The Trustee contends that these terms show that the

parties did not intend Equistar's payment of the Freight Charges Transfer to be contemporaneous

with LR2's delivery of the Cargo.  But this argument fails to give sufficient attention to the fact

that the Charter Contract, by way of incorporation of the Standard Form of Contract, and the

Freight Invoice, unambiguously stated that payment was due upon completion of the delivery of

Cargo.  The fact that the parties agreed to a 3 business day grace period for Equistar to wire

payment to LR2 before interest on the outstanding amount would start accruing does not change

the intended timing of the payment itself.

Also, even if the parties had intended payment to be made within 3 business days of the

delivery of the Cargo, such delay between delivery and payment would not be contrary to an

intention for a contemporaneous exchange.  Courts have found requisite intent under section

547(c)(1) despite delay between delivery and payment when the parties' conduct supports such a

finding, including when the parties act promptly under the circumstances.[45]  The Trustee's

---

[42]      *See Ames-Revere*, 2010 Bankr. LEXIS 2991, at *23, 2010 WL 2403104, at *7.

[43]      Pl. Undisputed Facts ¶¶ 3,9.

[44]      Def.  Undisputed Facts ¶ 11.

[45]      *See Peters v. Wray State Bank (In re Kerst)*, 347 B.R. 418, 424 (Bankr. D. Colo. 2006) (finding intent for a
transfer to be contemporaneous based on conduct of parties despite delay in perfection); *Tyler v. Swiss*

contention that a transaction must be wholly simultaneous to be contemporaneous imposes

unrealistic and unreasonable requirements on large and complex business transactions of this

kind that do not further the policy goals of preference law.

3. *Actual Contemporaneous Exchange*

Finally, to succeed in its contemporaneous exchange defense, LR2 must demonstrate that,

regardless of the intent of the parties, the exchanges were, in fact, substantially

contemporaneous.  This element has been satisfied.

Courts have held exchanges to be substantially contemporaneous "even when taking 7, or

even 20, days to complete."[46]  Rather than providing a bright line test, "contemporaneity is a

flexible concept" requiring "a case-by-case inquiry" into the circumstances.[47]  This inquiry

examines a variety of relevant circumstances, including "(1) the length of delay, (2) the reason

for the delay, (3) the nature of the transaction, (4) the intentions of the parties, and (5) the

possible risk of fraud."[48]  Courts also consider whether the exchange occurred consistent with the

time frame established by the parties.[49]

Here, payment was made promptly after the Cargo was delivered, with a delay of only

two business days.  The logistics of verifying delivery and moving such substantial sums

understandably took time, which is why Equistar's and the industry's norm was to allow a 3 day

grace period after delivery for payment to be made before incurring any penalty.[50]  Equistar had

---

*American Securities, Inc. (In re Lewellyn & Co., Inc.)*, 929 F.2d 424, 428 (8th Cir. 1991) (finding intent of contemporaneous exchange based on conduct of parties when agreement required payment be made within 7 days of performance by transferee).

[46]  *See Ames-Revere*, 2010 Bankr. LEXIS 2991, at *26, 2010 WL 2403104, at * 8.

[47]  *Id.*

[48]  *Id.*

[49]  *See Bridge Information*, 321 B.R. at 256-57.

[50]  Dudley Decl. ¶ 12; Supp. Dudley Decl. ¶¶ 6-8.

to review the discharge documents, conduct an independent inspection to verify delivery, and then arrange with its bank for payment to be made.[51]  Weighing all of the factors identified in *Ames-Revere*, the Court concludes that the Freight Charges Transfer was part of an exchange that was substantially contemporaneous.

LR2 has carried its burden as to each of the contemporaneous exchange defense.  As a result, the Freight Charges Transfer is protected from avoidance by the contemporaneous exchange exception in 547(c)(1).

## B.  Ordinary Course of Business

LR2 also contends that the Freight Charges Transfer is protected from avoidance by the ordinary course of business defense under section 547(c)(2)(A).  Here the Court disagrees with LR2.

The ordinary course of business defense is intended to protect transactions that arise and are paid in the ordinary course of business of both the debtor and the transferee.  Courts engage in a "subjective" analysis of the relationship between the parties, and consider a variety of factors, including "the prior course of dealing between the parties, the amount of the payment, the manner of the payment, and whether the payment was the result of any actions by the creditor or favoritism by the debtor."[52]  The Court finds that the Freight Charges Transfer was *not* made in Equistar's ordinary course of business because it was made incident to Equistar's policy of prioritizing payments to certain critical vendors over others.

This Court's prior holdings in several of the *Ames* preference adversary proceedings are squarely on point as to this issue, as each also involved a debtor that prioritized payments to

---

[51]     Guttinger Decl. ¶ 6.

[52]     *Ames Merchandising Corp. v. Cellmark Paper Inc., (In re Ames Dept. Stores, Inc.)* 450 B.R. 24, 32 (Bankr. S.D.N.Y.) (Gerber, J.) ("***Ames-Cellmark***"), *aff'd* 470 B.R. 280 (2012), *aff'd by summary order*, 506 Fed. Appx. 70 (2012), *.cert. denied*, 134 S.Ct. 65 (2013).

certain creditors during the preference period.  And in each of them the Court ruled that the

vendor could not rely on the Ordinary Course defense for that reason.[53]  Here, too, the Court

concludes, consistent with its reasoning in those decisions, that when the debtor suspended

normal payment processes and determined to make payments to some creditors and not to others,

those payments no longer could be found to have been made in the ordinary course of business.

That is exactly what Equistar did in late 2008 when it stopped making payments through its

automated payments system and made payments to certain critical vendors, including LR2.  Thus

LR2 has not carried its burden with respect to the ordinary course of business defense under

section 547(c)(2)(A).

## C.  Ordinary Business Terms

But LR2 further argues that the Freight Charges Transfer cannot be avoided because it

was made according to ordinary business terms, protecting the transfer under the other

subsection of section 547(c)(2), (c)(2)(B).[54]  In this respect, the Court agrees.

To succeed in asserting this defense, LR2 must show by a preponderance of evidence that

(i) the debt giving rise to the allegedly preferential transfer was incurred in Lyondell's and LR2's

---

[53]    *See Ames-Cellmark*, 450 B.R. at 27, 34 (noting that as Ames' liquidity was tightening, it began holding regular meetings to decide which vendors should be paid, and that "Ames' practice of identifying the favored creditors who would be paid in the period of its tightening liquidity (while others would not be)" was significant in finding inapplicability of Ordinary Course defense); *Ames-Revere*, 2010 Bankr. LEXIS 2991 at *28, 2010 WL 2403104, at *9 ("… as the facts clearly demonstrate that Ames broke with its ordinary business practices by… deciding who should and should not be paid, rather than mailing the checks as they were printed when payment became due.  As a result, its payments were not made in the ordinary course of business"); *Ames Merchandising Corp. v. Unical Enterprises, Inc. (In re Ames Dept. Stores, Inc.)*, 2010 Bankr. LEXIS 5115 at *5, 2010 WL 6052849 at *1 (Bankr. S.D.N.Y. Sept. 10, 2010) (Gerber, J.) ("when Unical came to learn, in pretrial proceedings in this adversary proceeding, that its checks had been held for review by an Ames committee before mailing, it was put on notice of a material deviation from Ames' ordinary course of business").

[54]    Section 547(c)(2)(B) provides that a transfer meeting the elements of section 547(b) may not be avoided: "to the extent that such transfer was in payment of a debt incurred by the Debtor in the ordinary course of business or financial affairs of the Debtor and the transferee, and such transfer was … made according to ordinary business terms."

ordinary course of business, and (ii) that it was paid according to ordinary business terms.[55]

There is no dispute that the debt giving rise to the Freight Charges Transfer was incurred in the

ordinary course of business of both Equistar and LR2, but the parties disagree whether the

Freight Charges Transfer was paid according to ordinary business terms. The Court finds that it

was.

Unlike the "ordinary course of business" defense under section 547(c)(2)(A) (which

requires a subjective analysis of the parties' business dealings), the ordinary business terms

defense is an "objective" test which "looks not to the specifics of the transaction between the

debtor and the particular creditor, but rather focuses on general practices in the industry."[56]  It is

"well established that the creditor's industry is the measure for ordinariness under this

subsection."[57]

As explained by the Second Circuit in *Roblin Industries*, "'ordinary business terms'

refers to the general practices of similar industry members and that 'only dealings so

idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore

outside the scope of subsection C.'"[58]  "Under this standard, a creditor must show that the

business terms of the transaction in question were 'within the outer limits of normal industry

---

[55]        Section 547(c)(2)(B).

[56]        *Abovenet, Inc. v. Lucent Technologies, Inc. (In re Metromedia Fiber Network, Inc.),* 2005 Bankr. LEXIS 3168, *17, 2005 WL 3789133, *5 (Bankr. S.D.N.Y. Dec. 20, 2005) (Hardin, J.) ("**Metromedia**").

[57]        *Pereira v. United Parcel Service of America, Inc. (In re Waterford Wedgwood USA, Inc.),* 508 B.R. 821, 828 (Bankr. S.D.N.Y. 2014) (Lane, J.) ("**Waterford Wedgwood**") (citing *Matter of Midway Airlines,* 69 F.3d 792, 797 (7th Cir. 2004); *Sigmon v. Butner (In re Johnson Bros. Trucker, Inc.),* 2001 WL 520649, *4 (4th Cir. May 15, 2001); *Sass v. Vector Consulting, Inc. (In re Am. Home Mortgage Holdings, Inc.),* 476 B.R. 124, 140–41 (Bankr. D.Del. 2012); *Hechinger Liquidation Trust v. James Austin Co. (In re Hechinger Inv. Co. of Delaware, Inc.),* 320 B.R. 541, 550 (Bankr. D.Del. 2004)).

[58]        78 F.3d at 39–40 (quoting *In re Tolona Pizza Products Corp.,* 3 F.3d 1029, 1033 (7th Cir.1993)).

14

practices…'"[59]  The "statutory language should not be construed to place businessmen in a straitjacket."[60]

The Court notes that "[s]ome latitude exists under the objective prong" in defining industry standards;[61] the inquiry does not focus on "the specifics of the transaction between the debtor and the particular creditor", but to the general elements of the transaction as compared to the practices of the industry.[62]  In considering the ordinary business terms defense, some courts have compared the timing of alleged preference payments with the timing of payments in the industry as a whole to determine whether the transfer at issue comports with industry custom.[63]

Here there is no dispute that the Charter Contract reflected typical contractual terms for a shipping contract of this kind, or that the Freight Charges Transfer was made in accordance with the terms of the Charter Contract and the Freight Invoice.  Based on the parties' supporting declarations, the 3 business day grace period between delivery and payment appears to be typical in the petrochemical industry in light of logistical and administrative demands.[64]  In addition, it is typical within the industry for payment to be made within the 3 business day grace period.[65]  Accordingly, because the Freight Charges Transfer was made consistent with the Charter Contract and the Freight Invoice, the Court sees no basis for considering the terms of the Freight

---

[59]    *Id.; see also Luper v. Columbi Gas of Ohio, Inc. (In re Carled, Inc.),* 91 F.3d 811, 818 (6th Cir.1996) (payments are made according to ordinary business terms so long as they are not "aberrational, unusual or idiosyncratic" for creditors in the defendant's industry).

[60]    *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co., Inc. (In re Gulf City Seafoods, Inc.),* 296 F.3d 363, 368 (5th Cir. 2002).

[61]    *Waterford Wedgwood,* 508 B.R. at 829 (quoting *G.G. Leidenheimer Baking Co., Ltd. v. Sharp (Matter of SGSM Acquisition Co.),* 439 F.3d 233, 239 (5th Cir. 2006)).

[62]    *Metromedia,* 2005 Bankr. LEXIS 3168, at *17, 2005 WL 3789133, at *5.

[63]    *Waterford Wedgwood*, 508 B.R. at 835.

[64]    Dudley Decl. ¶ 12.

[65]    Dudley Decl. ¶¶ 5-10.

Charges Transfer to be anything other than consistent with ordinary business terms within the industry.

Contrary to the Trustee's argument, inquiry into the transferor's internal accounts payable policies and procedures (which here were plainly similar to those in the *Ames* cases)—while relevant to the subjective analysis under section 547(c)(2)(A)—is not relevant to the objective analysis under section 547(c)(2)(B). To do otherwise—*i.e.*, to include it in the ordinary business terms analysis of section 547(c)(2)(B)—would render 547(c)(2)(A) "surplusage, and would also raise the requirements of the standard in a way that Congress did not do in the plain language of BAPCPA."[66] In any event, the Court cannot agree that the reason for Equistar's timely payment to LR2 constitutes a "term" of the Freight Charges Transfer (or the other transfer at issue).[67]

Finally, the Court notes that there is nothing in the record indicating that LR2 took any "extraordinary collection efforts" that could jeopardize the Freight Charges Transfer's satisfaction of the elements of the ordinary business terms defense.[68] Absent such conduct by LR2, the avoidance of the Freight Charges Transfer would not pursue the fundamental purpose of the preference provisions to "discourage creditors from hastily forcing troubled business into bankruptcy."[69] LR2 simply performed its obligations under the Charter Contract and accepted

---

[66]    *See Waterford Wedgwood*, 508 B.R. at 833-34 (finding ordinary business terms defense does not evaluate parties' business course).

[67]    *See Metromedia*, 2005 Bankr. LEXIS 3168, at *24, *30, 2005 WL 3789133, at *8, *10, ("[a] threshold point of inquiry is whether any of the *enumerated terms* of the [transfer] was, in fact, 'unique' or 'different'.") (emphasis added).

[68]    *Cf. Caplan v. Peterson Engineering Co. (Matter of Century Brass Products, Inc.)*, 121 B.R. 136, 139 (Bankr. D. Conn. 1990) (rejecting ordinary business terms defense in part because creditor-transferee had taken aggressive collection steps in the lead up to the debtor's bankruptcy).

[69]    *Waterford Wedgwood*, 508 B.R. at 833 (citing *Roblin Industries* for the two-fold purpose of preference law: "the concern for the equitable treatment of all creditors as well as the desire to discourage creditors from hastily forcing troubled businesses into bankruptcy.").

Equistar's timely payment.  The Court finds that this is "precisely the kind of behavior the ordinary course of business exception was intended to protect."[70]

## II.

### The Quay Dues Transfer

The Court holds that the Quay Dues Transfer satisfies the ordinary business terms defense for similar reasons.  The Court notes, and accepts, LR2's expert's testimony that it is common practice for a charterer to reimburse a vessel owner of any expenses incurred during the voyage and advanced by the vessel owner at the conclusion of the voyage and at the same time that freight payments are made.[71]  Equistar has not challenged this assertion.  Thus the timing of Quay Dues Transfer was consistent with industry norms.

While the record is limited with respect to the other terms of the Quay Dues Transfer, the Court does not find any basis to find that such terms were beyond "the outer limits of normal industry practices."[72]  And as with the Freight Charges Transfer, LR2 did not take any extraordinary collection efforts to expedite payment by Equistar.

As a result, the Court finds that the Quay Dues Transfer was made according to ordinary business terms, and cannot be avoided by the Trustee.

### Conclusion

For the above stated reasons, the Court finds that:

(1) the Freight Charges Transfer was both a contemporaneous exchange for new value and made pursuant to ordinary business terms; and

(2)  the Quay Dues Transfer was made pursuant to ordinary business terms.

---

[70]    *Id.*

[71]    Dudley Decl. n. 1.

[72]    *Roblin Industries,* 78 F.3d at 39–40 (internal citation omitted).

Hence each cannot be avoided.

LR2 is to settle a judgment in accordance with this Decision.

Dated: New York, New York                    _s/**Robert E. Gerber**_____
         September 18, 2015                    United States Bankruptcy Judge

18